IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PREWITT ENTERPRISES, INC.,            )
On Its Own Behalf And On Behalf       )
Of All Others Similarly Situated,     )
                                      )   CIVIL ACTION NUMBER
              PLAINTIFFS,             )
                                      )   CV-00-W-0865-S
VS.                                   )
                                      )
ORGANIZATION OF THE                   )
PETROLEUM EXPORTING                   )
COUNTRIES,                            )
                                      )   **ENTERED**
              DEFENDANT.              )
                                          **MAR 2 2 2001**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This antitrust class action is now before the Court on the Application and

Memorandum of Law in Support of Application for Default Judgment and

Appropriate Declaratory and Injunctive Relief by plaintiff Prewitt Enterprises,

Inc., on its own behalf and on behalf of the Class.

On January 9, 2001, the Court entered a Show Cause Order directing

defendant Organization of the Petroleum Exporting Countries, to appear before

the Court on March 8, 2001, and show cause, if any it has, why plaintiff's

Application should not be granted and why judgment by default against it should

not be entered. Defendant OPEC was served with the said Show Cause Order and

the Application by means of Federal Express international delivery at its offices in

Vienna, Austria, to the attention of the Office of the Secretary General. The proof

of completed service filed with the Court shows that such service was made on January 15, 2001.

In accordance with the said Show Cause Order, OPEC's responsive papers, if any, were due on or before February 12, 2001. No such response was filed. A hearing in open court on the said Application was duly conducted on March 8, 2001. Plaintiff appeared at the hearing through counsel and argued the cause. Defendant OPEC failed to appear at the hearing.

Therefore, the plaintiff's aforesaid Application and Memorandum of Law in Support of Application for Default Judgment and Appropriate Declaratory and Permanent Injunctive Relief is ripe for consideration and determination by the Court.

## FINDINGS OF FACT

Based upon the proceedings held in open court, the pleadings, the plaintiffs' Application and a Supplement to said Application, including the expert submissions of the economist Dr. Philip K. Verleger, Jr., the Declaration of Carl Prewitt, and all evidentiary exhibits annexed thereto, and all other materials on file in this action, the Court, being fully informed in the premises, the following constitute the Court's findings of fact pursuant to Fed. R. Civ. P. 52(a):

1.      This action was commenced on April 4, 2000. OPEC was served with the summons and complaint on April 17, 2000, by international, registered United States mail, with a signed, return receipt, pursuant to Fed. R. Civ. P.

2

4(h)(2) and 4(f)(C)(ii).

      2.      OPEC failed to appear, answer, plead or otherwise defend this

action.

      3.      On December 11, 2000,  the Court directed the Clerk to enter default

against OPEC in accordance with Fed. R. Civ. P. 55(a) and the same was so

entered.

      4.      On December 11, 2000, the Court entered an order certifying a

plaintiff Class in this action under and pursuant to Fed. R. Civ. P. 23(b)(2),

defined as follows:

> All persons or entities who purchased refined petroleum products in
> the United States from March 1999 to the present.  Excluded from
> the class are all governmental entities, the Organization of
> Petroleum Exporting Countries ("OPEC"), and its co-conspirators,
> and all judicial officers of the United States.

      5.      The Class was certified with respect to the following causes of

action:

> All claims against OPEC for injunctive or corresponding declaratory
> relief under the federal antitrust laws premised upon an alleged
> conspiracy or agreement(s) to restrict production and exportation of
> crude oil in order to unlawfully and illegally raise, maintain,
> stabilize and fix the price thereof on world markets with the
> foreseeable impact of artificially inflating the prices of  refined
> petroleum products in the United States after March 1999.

      6.      The Court designated Plaintiff Prewitt Enterprises, Inc. as Class

Representative.  Prewitt is a purchaser of  petroleum products refined from crude

oil.  Prewitt purchases substantial quantities of gasoline and diesel fuel

(560,291.43 gallons in 2000) and other refined oil products for resale to the public at its gasoline station, "Eastwood Texaco Service Center," near the Eastwood Mall in Birmingham, Alabama.

7.     Defendant OPEC is an organization formed in Baghdad, Iraq, in 1960, with its principal place of business currently at Obere Donaustrasse 93, Vienna A-1020, Austria. OPEC's members are Iraq, the Socialist People's Libyan Arab Jamahiriya, the Islamic Republic of Iran, Saudi Arabia, the United Arab Emirates, Qatar, Kuwait, Algeria, Nigeria, Indonesia and Venezuela. OPEC's members are not named defendants in this action.

8.     OPEC's members together have a dominant share of world crude oil production (particularly of "free supplies" available for export). OPEC's members control more than 3/4 of the world's proven crude oil reserves and are responsible for more than 60 percent of world oil exports, which figure increases to 83 percent when the production of non-OPEC members Mexico, Norway, the Russian Federation and Oman, who (as detailed below) conspired with OPEC, is taken into account.

9.     OPEC was formed for the primary purpose of coordinating the negotiation, execution and implementation of agreements regarding the production and exportation of crude oil by its members for the purpose, among other things, of maximizing the economic benefits of such production for its members. In making this finding, the Court has the benefit of extensive

4

documentary evidence, much of it published by OPEC itself and submitted in an
evidentiary volume; the affidavit testimony of Mr. Prewitt; and expert testimony
through the affidavit of Dr. Philip K. Verleger, Jr.  At the hearing, the Court
admitted such documents into evidence.  With respect to Dr. Verleger's testimony,
the Court finds that Dr. Verleger is an economist with extensive experience in
energy matters and a former adviser to the United States Government who
specializes in, and is fully qualified to provide expert testimony on, the nature of
the world oil market, the nature of OPEC and its actions, and the significance and
impact of those actions on world and United States trade and commerce.  In his
report, Dr. Verleger has provided the Court with extensive statistical and other
evidence concerning such issues.

10.    Based on the evidence before it, the Court finds it beyond dispute
that OPEC was created and exists for the express purpose of coordinating,
limiting, stabilizing and otherwise controlling crude oil production and export in
order to increase its members' revenues. The foregoing remains OPEC's principal
purpose some 40 years after its creation.

11.    As relevant here, beginning in or about March 1998, and in
furtherance of this purpose, OPEC coordinated and began implementation of an
agreement to restrict the production and export of crude oil by its members in
amounts totaling 3.1 million barrels per day, thus taking those amounts off the
world supply. The March 1998 agreement was followed by a similar agreement in

5

June 1998. Performance of the March 1998 and June 1998 agreements, however, failed to "bolster prices," as had been OPEC's goal, according to its then-President, Dr. Youcef Yousfi.

12.     Accordingly, in March 1999 OPEC coordinated and began implementation of yet more extensive production cuts. OPEC stated plainly that its goal was to "bolster prices by reducing supply" and thereby to recoup the "tremendous financial loss to oil producers" that had allegedly resulted from the increasingly lower prices enjoyed by U.S. and other consumers during the 1990's. In order to accomplish this purpose, OPEC imposed specific production "quotas" on its members. *See, e.g.,* "107th Meeting of the OPEC Conference," OPEC Press Release No. 2/1999 (March 23, 1999), at 1-2 (setting forth specific production levels in order to reduce supply by 2.1 million barrels per day beyond the March 1998 production cuts); and "Report of the 26th Meeting of the [OPEC] Ministerial Monitoring Sub-Committee," OPEC Press Release No. 4/1999 (July 30, 1999), at 1 (confirming the March 1999 price-fixing agreements and reporting on their implementation). Dr. Verleger states that the combined effect of these production cuts was to reduce total world oil production by 7 percent, and reduce "free supplies" of crude oil by 13 percent.

13.     Because of the restrictions on output imposed by these agreements, world oil supply quickly declined through the ensuing months and prices of crude oil and refined petroleum products took a dramatic upward turn, such that U.S.

6

gasoline prices at the pump soon reached their highest levels since the 1991 Gulf
War.

14.     In March 2000, having achieved its goal of higher crude oil prices,
OPEC coordinated and began implementation of a further agreement providing
for modest production *increases* by OPEC's members, with the avowed goal of
stabilizing crude oil prices at their now-elevated levels. The March 2000
agreement included a unique provision empowering OPEC's President, Ali
Rodriguez-Araque, to direct such production cuts or increases by OPEC's
members as might be needed to maintain oil prices within a "collar" or "price
band" of $22 to $28 per barrel. The March 2000 agreement provided that when
crude oil prices fell below $22 per barrel or rose above $28 per barrel for an
extended period, OPEC's President would direct OPEC members to decrease or
increase production to the extent determined necessary to restore prices to the
$22-$28 per barrel band. The price-stabilization band was intended at the upper
$28 limit to prevent fringe, high-cost producers from initiating new production
and thus adding to world oil supply with a resulting decrease in crude oil prices.
Similarly, the lower, $22 limit was intended to sustain a minimum level of
monopoly profits acceptable to OPEC. The collar or price band was thus
designed to maximize long-term OPEC revenue by ensuring high current prices
and discouraging investment that might reduce demand for OPEC oil. Moreover,
as Dr. Verleger points out:

7

The recent implementation of the price band strategy has been and will remain particularly pernicious because OPEC has positioned the band such that inventory levels will not rise from their current, historically low levels. Because $22 is still above the long-run competitive price of approximately $18.84/barrel (discussed below), if OPEC is able to hold prices within the band, inventories will not grow. Holders of inventory will continue selling off their current supplies, and retaining only minimal stocks. Because production capacity utilization is extremely high among non-OPEC suppliers, little opportunity exists for inventories to be rebuilt if OPEC discipline holds. In such an environment, OPEC's already-significant market power is enhanced because inventories are unavailable as a short-term cushion against output reductions.

* * *

In this context OPEC's implementation of a "price band" must be interpreted as a balancing of the cartel's short-term and long-term interests. By setting the lower limit of the band at $22 per barrel, prices are kept consistently above competitive levels, thus securing monopoly profits. In the longer term, the price band discourages development of more expensive supply sources in at least two ways. First it eliminates the prospect of constant escalation in prices. It was not only high prices that drew out expensive supplies in the past, but also the then-current forecasts of constantly escalating future prices. Second, a formal (but ambiguously defined) $28 upper limit to the band makes development and exploration of high cost reserves more risky. The openly stated threat of supply increases to drive down prices in the event they exceed $28 would make it chancey to rely upon prices anywhere near this level in making development decisions. In fact, confusion over if and when such a supply increase might occur or with regard to dissention within OPEC over the cap itself only serves to increase the uncertainty about prices and to discourage development investments in more costly reserves.

15.     The March 2000 agreement was soon followed by similar

agreements in June 2000 and October 2000 to inject agreed amounts of additional

oil supply into the market in order to further stabilize and maintain the artificially

8

elevated prices.

16.     On January 17, 2001, after being served with the Show Cause Order,

and thus with knowledge of the relief sought herein, OPEC announced yet another

1.5 million barrels per day production cut, with the purpose and effect of fixing

and stabilizing crude oil prices:

> Having reviewed the oil market situation and supply/demand
> expectations for the forthcoming period, the Conference has agreed
> to decrease overall production by 1.5 million barrels per day,
> applicable from February 1, 2001....
>                              * * *
>
> With the approach of seasonally lower demand in the second
> quarter, unchecked production could precipitate a price collapse,
> serving the short- and longer-term interests of neither producers nor
> consumers. Given the precarious supply/demand situation, and
> desirous of maintaining crude oil prices at agreed levels, the
> Conference instructed the Secretariat to continuously follow-up and
> report on developments taking place in the market.

See "113th (Extraordinary) Meeting of the OPEC Conference," OPEC Press

Release No. 2/2001 (January 17, 2001), at 1; "Opening Address to the 113th

(Extraordinary) Meeting of the OPEC Conference by HE Dr. Chakib Kehelil,

President of the Conference and Minister of Energy and Mines, Algeria," OPEC

Press Release No. 1/2001 (January 17, 2001); see also "Acting in Anticipation,"

OPEC Bulletin Commentary,  http://www.opec.org/NewsInfo/

BulletinCommentaries/bc2001/BC1_2001.htm (January 2001).

17.     The foregoing production and export agreements were designed and

implemented for the purpose of fixing, raising and stabilizing crude oil prices

9

above competitive levels.

18. OPEC was aided and abetted in the coordination and
implementation of the foregoing agreements by other persons and entities acting
in conspiracy with it, including but not limited to OPEC's members,[1] and by non-
OPEC members Norway, Mexico, the Russian Federation and Oman.

19. In order to render an opinion whether these OPEC-coordinated and
implemented agreements had an adverse impact on United States trade and
commerce during the period March 1999 to date, Dr. Verleger created
econometric models based on well-established economic principles and
techniques to: (i) estimate a "but-for" price, *i.e.*, a price that would be expected
for crude oil in a competitive market free of artificial constraints on supply or
demand; (ii) determine whether and to what extent crude oil prices exceeded the
"but-for" price during that period; and (iii) determine whether and to what extent
any excess crude oil prices were passed-on to purchasers of refined petroleum
products in the United States.

20. Based on the evidence, Dr. Verleger concluded, and the Court finds,
that the foregoing, OPEC-coordinated agreements had a substantial and adverse
impact on United States trade and commerce. In summary:

> ● Absent artificial constraints, the price for crude oil
> during the period March 1999 to date should have\
> averaged $18.84.

---

[1] Excluding Iraq, which the evidence shows was not a participant in such
agreements.

10

● Production cutbacks resulting from an agreement
reached in March 1999 among OPEC members
and certain non-OPEC members (including
Mexico, Norway and Oman), and coordinated and
implemented by OPEC, succeeded in reducing
crude oil supply in world markets and in drawing
down world inventories (stocks) of crude oil.

● The OPEC-orchestrated reduction in supply and stocks
had the intended effect of raising the prices for OPEC
production and for crude oil generally above the

$18.84

level that would have prevailed "but for" OPEC's
actions.

● Such artificially-elevated prices first appeared in the
markets beginning in May 1999.

● During the period May 1999 to date, crude oil prices
reflected a range of $4-$6 per barrel in excess costs
attributable to OPEC's coordination and
implementation of the March 1999, March 2000, June
2000 and October 2000 price-fixing and price-
stabilization agreements.[2]

● Approximately 90% of the excess costs ranging from
$4-$6 per barrel in crude oil prices was passed
through to buyers in the United States in the form of
materially higher prices for such refined petroleum
products as gasoline, diesel fuel and home heating oil.

21.   Accordingly, there has been an impact, indeed a substantial impact,

_____

[2] Dr. Verleger noted that his proposed range of $4-$6 per barrel in excess
costs – the "overcharge," in antitrust economics terms – was derived using
conservative assumptions, resolving uncertainties in favor of finding a lesser,
rather than a greater, restraint on trade, notwithstanding what he found to be
sound economic evidence that the impact on trade and commerce has been greater.
His conclusions thus have all the more force for purposes of these findings of fact.

11

on the prices of refined petroleum products as a direct result of the OPEC actions

at issue in this case. Based on the evidence before the Court of the volume of

refined petroleum products sold in the United States, the Court finds that from

May 1999 to date, and using the $4-$6 per barrel range determined by Dr.

Verleger, there has been a *daily* impact on the order of $80-$120million in excess

costs paid by United States consumers as a result of OPEC's actions. This would

translate to approximately $26.3-$39.4 billion per year as long as the OPEC-

orchestrated price distortion continues to at least its past extent.

22.      It is clear that OPEC in fact does continue to maintain its

production and output restraint agreements and will do so for the foreseeable

future. As noted, the most recent such agreement was just entered into in mid-

January 2001. Since then, OPEC has publicly stated its intention to persist in such

conduct in the future by negotiating, entering into, implementing and enforcing

such agreements. OPEC did in fact engage in such conduct again at the next-

scheduled meeting of the OPEC Conference, held in Vienna on March 16-17,

2001. OPEC there announced a further agreement to cut production by 1 million

barrels per day, for the stated purpose of "stabiliz[ing] the market. . . ." *See*

"Opening Address to the 114[th] Meeting of the OPEC Conference," OPEC Press

Release No 3/2001 (March 16, 2001); "114[th] Meeting of the OPEC Conference,"

OPEC Press Release No. 4/2001 (March 17, 2001); and "OPEC Cuts Oil

Production, Even as It Mulls Boosting Production During the Summer," *The Wall*

12

*Street Journal* (March 19, 2001). OPEC persists and threatens to persist in such
conduct notwithstanding that crude oil prices ended the year 2000 at their highest
levels in 17 years with a resulting, adverse impact on the prices of refined
petroleum products purchased by plaintiff and the Class.

    23.    The threat of continued injury from OPEC's restraints of trade
therefore remains unabated.

## CONCLUSIONS OF LAW

    In accordance with the foregoing, the Court makes the following
conclusions of law pursuant to Fed. R. Civ. P. 52(a):

    1.    This Court has subject-matter jurisdiction of the Sherman Act claims
in this action under 28 U.S.C. §1331 and 15 U.S.C. §§ 22, 26. Plaintiff has
standing to bring this action for injunctive relief under § 16 of the Clayton Act (15
U.S.C. § 26) to redress the defendant's violation of § 1 of the Sherman Act (15
U.S.C. § 1).

    2.    Defendant OPEC is an "unincorporated association" within the
meaning of Fed. R. Civ. P. 17(b)(1), and may thus be sued in this Court "in its
common name for the purpose of enforcing ... against it a substantive right
existing under the Constitution or laws of the United States," in this case, the
Sherman and Clayton Acts.

    3.    The activities of OPEC described above are within the subject
matter jurisdiction of this Court under the Sherman and Clayton Acts. The

13

production and output restriction agreements described above constitute
agreements coordinated and implemented by OPEC to unlawfully fix, maintain
and stabilize oil prices and otherwise to restrain trade in the production and sale of
oil, with a substantial and foreseeable adverse impact on United States trade and
commerce. The Sherman Act plainly reaches agreements in restraint of trade
entered into by foreign entities such as OPEC acting abroad that have a substantial
and adverse impact in the United States. *Hartford Fire Ins. Co. v. California*, 509
U.S. 764 (1993).

    4.     This Court also has *in personam* jurisdiction over OPEC.
Defendant OPEC was duly served with process in this action by United States
international registered mail in accordance with Fed. R. Civ. P. 4(h)(2) and
4(f)(C)(ii) at its headquarters in Vienna, Austria, and filed no response thereto
within the time allowed by law. As previously set forth in the Court's Order dated
December 11, 2000, OPEC therefore defaulted and the Clerk was directed to enter
such default pursuant to Fed. R. Civ. P. 55(a).

    5.     The Court further finds that by virtue of its acts abroad having the
requisite impact in the United States, OPEC also has the requisite minimum
contacts with the United States, such that it is fully consistent with fair play and
substantial justice for OPEC to be required to defend this action in the United
States. Moreover, OPEC does not possess any other form of jurisdictional
immunity from the application of the United States antitrust laws. As a threshold

14

matter, any such immunity would be an affirmative defense, as to which OPEC

would bear the burden of proof. As noted, OPEC has made no defense and the

allegations of the Complaint are therefore deemed admitted. Fed. R. Civ. P. 8(d).

Even if it were considered as an element of the Court's subject matter jurisdiction,

however, and thus an issue the Court should address on its own motion, the Court

concludes that OPEC is not itself a foreign state or an agency or instrumentality of

a foreign state; rather, by its own description, OPEC is a "voluntary inter-

governmental organization" based in Vienna, Austria. *See* OPEC's official

Internet site, http://www.opec.org/faqs.htm . Therefore, neither the Foreign

Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, nor the act of state doctrine,

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), is implicated in this

action.

      6.     OPEC's members, of course, are foreign states. They are not,

however, parties to this action, although the Court has found that they and other

persons and entities acting in concert with OPEC were and are co-conspirators

with OPEC in the crafting and development of the illegal agreements discussed

above. Thus, for purposes of the Court's finding as to their status as co-

conspirators with defendant OPEC, the Court further holds that neither OPEC's

members nor the relevant non-OPEC producers Mexico, the Russian Federation,

Norway and Oman enjoy any form of immunity from the consequences of such a

finding. The acts in question involve agreements to restrict output and thereby

15

affect prices of a commodity vital to United States trade and commerce. These
acts are plainly commercial in nature because they are acts that, while illegal, can
be performed by private persons as well as sovereign states. Indeed, such
restraints have played out during the entire history of enforcement under the
Sherman Act. *See, e.g., Standard Oil Co. of New Jersey v. United States*, 221
U.S. 1 (1911). Accordingly, there can be no sovereign immunity with respect to
such acts. *See* 28 U.S.C. § 1605(a)(2); *Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607, 613 (1992).

 7. Similarly, because the acts are commercial in nature, they are not
protected from judicial scrutiny by virtue of the act of state doctrine, which is a
judge-made rule based largely on separation of powers concerns suggesting a
reluctance to determine the legality of acts of foreign states taken within their own
territories. The Court is aware that in *Int'l Assoc. of Machinists and Aerospace
Workers v. OPEC*, 649 F.2d 1354 (9th Cir. 1981), the Ninth Circuit concluded
that it was barred under the act of state doctrine from determining whether
OPEC's members had violated the Sherman Act with respect to a series of earlier
acts in restraint of trade. The Ninth Circuit's decision is distinguishable for a
number of reasons, the most important of which is that the defendants were the
OPEC members, not OPEC. Moreover, the Ninth Circuit did not give meaningful
weight to the decision of a plurality of the Supreme Court in *Alfred Dunhill of
London, Inc. v. Republic of Cuba*, 425 U.S. 682, 696-699 (1976), which held that

16

there is a commercial activities exception to the act of state doctrine. Applying

that exception, it is clear that commercial activities such as those at issue in this

case are entirely within the Court's judicial competency, regardless of the identity

of the actor. The Supreme Court's analysis in *Dunhill* has been followed since the

Ninth Circuit's decision, and the act of state doctrine has generally been narrowed.

*See, e.g., W.S. Kirkpatrick v. Environmental Tectonics Corp.*, 493 U.S. 400

(1990); *Ampac Group, Inc. v. Republic of Honduras* , 797 F. Supp. 973, 978 (S. D.

Fla. 1992); *Eckerd Int'l Inc. v. Gov't of Fiji*, 834 F. Supp. 167, 171-72 (E. D. Va.

1993). The Court concludes that such analysis is likely to command a majority of

the Court if presented in a proper case. Second, the acts in question were

performed outside the territories of OPEC's members (*e.g.*, at meetings held at or

coordinated from OPEC's headquarters in Vienna, Austria) and are thus in all

events and by definition outside the so-called "territorial limitation" of the act of

state doctrine. *Sabbatino*, *supra*, 376 U.S. at 428 (limiting the scope of any

restraint on adjudication to the court's review of the legality of "a taking of

property within its own territory"). Finally, the genesis of the act of state doctrine

in *Sabbatino* was the Court's professed reluctance to determine whether an

expropriation violated international law, in a context where international law

standards were uncertain. Here, the only issue is whether OPEC's actions

constitute a restraint of trade under the Sherman Act, as to which the legal

standards are crystal clear. *See generally* Note, "The Applicability of the Antitrust

17

Laws to International Cartels Involving Foreign Governments," 91 YALE L. J. 765
(1982).

8.     The elements of the unlawful price-fixing violation of § 1 of
the Sherman Act alleged by plaintiff in this action are as follows:  (a) an
explicit agreement; (b) to set a particular price, restrict output, or otherwise to
affect the price of a commodity (here crude oil) affecting United States trade or
commerce.  *See* XII H. Hovenkamp, ANTITRUST LAW § 2004 (1999); *United
States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223-224 (1940) ("Under the
Sherman Act a combination formed for the purpose and with the effect of raising,
depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or
foreign commerce is illegal *per se*. Where the machinery for price-fixing is an
agreement on the prices to be charged or paid for the commodity in the interstate
or foreign channels of trade, the power to fix prices exists  if the combination has
control of a substantial part of the commerce in that commodity").

9.     The agreements coordinated and implemented by OPEC to restrict
and control the production and export of crude oil by OPEC's members are illegal
*per se* under the Sherman and Clayton Acts.  *See Broadcast Music, Inc. v.
Columbia Broadcasting System*, 441 U.S. 1, 19-20 (1979) (blatantly anti-
competitive agreements that predictably "tend to restrict competition and decrease
output are to be condemned as unreasonably and illegal *per se*  without elaborate
inquiry as to the precise harm they have caused or the business excuse for their

18

use"); *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958).

10.    The class represented by plaintiff in this action –"All persons or

entities  who purchased refined petroleum products in the United States from

March 1999 to the present" – are indirect purchasers as to OPEC; that is, the class

members do not purchase oil directly from OPEC, but rather purchase petroleum

products refined from crude oil by other entities.  As indirect purchasers, the

members of the class may not maintain a federal antitrust action for money

damages. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).[3]  However, *Illinois*

*Brick* does not preclude an action by indirect purchasers for the Court's

declaration that the defendant's actions violate § 1 of the Sherman Act and for

injunctive relief under § 16 of the Clayton Act, which provides that "[a]ny person,

firm, corporation, or association shall be entitled to sue for and have injunctive

relief, in any court of the United States having jurisdiction over the parties, against

threatened loss or damage by a violation of the antitrust laws" to prospectively

preclude that violation. *See, e.g., In re Beef Industry Antitrust Litigation*, 600

F.2d 1148, 1167 (5th Cir. 1979), *cert. denied sub nom. Lowe v. Safeway Stores,*

*Inc.*, 449 U.S. 905 (1980); *Mid-West Paper Products Co. v. Continental Group,*

*Inc.*, 596 F.2d 573, 589-594 (3d Cir. 1979); *Campos v. TicketMaster Corp.*, 140

_____

[3] If and to the extent indirect purchasers have a cause of action for damages
under the laws of any State, such claims are of course not precluded, *see*
*California v. ARC America Corp.*, 490 U.S. 93 (1989), and the Court expresses no
views on the viability of any such claims, nor would they be merged into any
judgment of this Court.

F.3d 1166, 1172 (8th Cir. 1998), *cert. denied*, 525 U.S. 1102 (1999); II P. Areeda
& H. Hovenkamp, ANTITRUST LAW § 346d (2000).  *See generally Zenith Radio
Corp. v. Hazeltine Research, Inc*., 395 U.S. 100, 132-133 (1969).

11.    Thus, in cases where the evidence demonstrates the existence of a
"real threat of future violation [of the antitrust laws] or a contemporary violation
of a nature likely to continue to recur" or when the "defendants ... have settled into
a continuing practice or entered into a conspiracy violative of antitrust laws," § 16
provides for equitable remedies against such conduct. *See United States v. Oregon
Medical Society*, 343 U.S. 326, 333 (1952).  The evidence in this case clearly
demonstrates the requisite threat of continuing or future similar violations of the
antitrust laws.

12.    Plaintiff, on its own behalf and on behalf of the Class, has carried its
burden of proof, and is entitled to entry of a default judgment under Fed. R. Civ.
P. 55(b) and an award of declaratory and injunctive relief under § 16 of the
Clayton Act for the defendant's violation of § 1 of the Sherman Act, as sought in
the Complaint.  Pursuant to Fed. R. Civ. P. 58, a separate Judgment and Order
embodying such relief is attached.

20

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **PREWITT ENTERPRISES, INC.,** | ) | |
| On Its Own Behalf And On Behalf | ) | |
| Of All Others Similarly Situated, | ) | |
| | ) | CIVIL ACTION NUMBER |
| *PLAINTIFFS,* | ) | |
| | ) | **CV-00-W-0865-S** |
| *VS.* | ) | |
| | ) | |
| **ORGANIZATION OF THE** | ) | |
| **PETROLEUM EXPORTING** | ) | |
| **COUNTRIES,** | ) | |
| | ) | |
| *DEFENDANT.* | ) | |

## FINAL JUDGMENT AND ORDER OF INJUNCTION

In accordance with the Findings of Fact and Conclusions of Law heretofore made, it is ORDERED, ADJUDGED and DECREED by the Court as follows:

1. Judgment by default pursuant to Fed. R. Civ. P. 55(b) is hereby rendered in favor of plaintiff and the Class and against defendant Organization of the Petroleum Exporting Countries.

2. The actions of defendant Organization of the Petroleum Exporting Countries, and those persons and entities in active concert and participation with defendant, consisting of crafting, developing, coordinating, monitoring, entering into, implementing and/or enforcing agreements regarding the production and export of crude oil are declared to constitute unlawful contracts, combinations or conspiracies in restraint of United States or foreign commerce in violation of § 1

of the Sherman Act (15 U.S.C. § 1), for which violation plaintiff and the Class are

entitled to appropriate relief under § 16 of the Clayton Act (15 U.S.C. § 26).

      3.      Pursuant to § 16 of the Clayton Act and Fed. R. Civ. P. 65,

defendant Organization of the Petroleum Exporting Countries, its officers, agents,

servants, employees and attorneys, and those persons and entities in active concert

and participation with them who receive actual notice of this Final Judgment and

Order of Injunction by personal service or otherwise, be and are each hereby

enjoined and restrained from entering into any agreements amongst themselves or

with third parties to raise, lower, or otherwise determine the volumes of

production and export of crude oil by any person or entity, and from crafting,

developing, coordinating, entering into, implementing and/or enforcing the

performance of any such agreements. This Order of Injunction shall expire twelve

(12) months after the date hereof, provided that the Court reserves continuing

jurisdiction to determine and enforce compliance with this Order of Injunction,

and, on further submission, to extend the duration thereof or to amend, expand,

modify, or otherwise vary the relief granted herein.

      4.      The Court expressly reserves jurisdiction over any request for an

award of attorneys' fees and reimbursement of litigation expenses to counsel for

plaintiff and the Class. The Court will entertain an application therefor if same is

filed within 60 days of the date hereof, and will enter a separate judgment granting

or denying the said application and, if granted, setting the amount of such award.

2

5. The costs of this action are taxed to defendant Organization of the

Petroleum Exporting Countries, for which let execution issue in accordance with

law.

DONE and ORDERED this _21st_ day of March, 2001.

Charles R. Weiner
Senior United States District Judge

3