FILED
02 AUG -2 PM 4:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
AUG 2 2002

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PREWITT ENTERPRISES, INC., on its )
own behalf and on behalf of all )
others similarly situated, )
)
    Plaintiff, )
)
vs. ) Civil Action Number
)
ORGANIZATION OF THE PETROLEUM ) 00-C-0865-S
PETROLEUM EXPORTING COUNTRIES, )
)
    Defendant. )
)

**MEMORANDUM OPINION ON DEFENDANT'S MOTION TO DISMISS FOR INADEQUATE SERVICE OF PROCESS**

This case implicates one of the pillars of American jurisprudence. "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Murphy Brothers, Inc. v. Mitchell Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999). The question before the Court in this important case is thus fairly straightforward: Has the Plaintiff Prewitt Enterprises, Inc. ("Prewitt") properly served process on Defendant Organization of Petroleum Exporting Countries ("OPEC") For the reasons which follow,

1

119

the Court concludes that the question must be answered in the negative.

I.

Prewitt is an Alabama corporation with its principal place of business in Birmingham, Alabama. It purchases substantial quantities of gasoline for resale to the public at its gasoline stations. On April 4, 2000, Prewitt filed this action against OPEC, alleging that OPEC fixes prices and sets quotas for the crude oil produced by its member nations, and that OPEC's practices violate the antitrust laws of the United States.[1]

OPEC is an international organization formed in Baghdad, Iraq in 1960, and presently headquartered in Vienna, Austria. OPEC's current members are: Iraq, the Socialist Peoples Libyan Arab Jamahiriya, the Islamic Republic of Iran, Saudi Arabia, the United Arab Emirates, Qatar, Algeria, Nigeria, Indonesia, and Venezuela. None of

---

[1] Plaintiff's law firm also filed an action against OPEC in the Superior Court of the District of Columbia, asserting claims under the local anti-trust laws of the District of Columbia and seventeen states. That action was dismissed on August 22, 2000. *Melnitchenko v. OPEC*, No. 00CA3173 (D.C. Super. Ct.) Plaintiff filed a motion for reconsideration, which is still pending.

OPEC's member nations are named in this action.[2] OPEC is here sued as an unincorporated association.

OPEC has moved to dismiss the action on a number of procedural and substantive grounds, including insufficiency of service of process. The resolution of the service of process issue makes it unnecessary to consider the other grounds of the Motion to Dismiss.

*Service of Process*

In its complaint, Prewitt specifically requested service on OPEC by registered mail. Accordingly, on April 6, 2002, the Clerk of the this Court sent to OPEC at its headquarters in Austria a copy of the summons and complaint via registered mail, return receipt requested.

The summons and complaint were delivered to OPEC's headquarters, and one of its employees signed the return receipt on April 17, 2000. On the same date, the summons and complaint were stamped "received" by OPEC's Administration

---

[2] The State of Kuwait, The United States Saudi Arabian Business Council, the Ministry of Petroleum and Mineral Resources For the Kingdom of Saudi Arabia, The Ministry of Middle East Institute, The American Business Association - Eastern Province, the Federal Republic of Nigeria, and the Ministry of Energy have been granted leave to file *amicus* briefs.

and Human Resources Department ("HRD"). The HRD delivered the pleadings to Dr. Shokri Ghanem, Director of OPEC's research division. After consulting with Dolores Dobarro (a "legal officer"), Dr. Ghanem forwarded the documents to Dr. Lukman, then Secretary General for OPEC. Dr. Ghanem and Dr. Lukman ultimately decided that "the Secretariat should ignore the whole thing." (Doc. 80, Pl.'s Evid. Materials at Ex. 1, OPEC Bates # 00032, 15.)

Prewitt never sought the assistance of the Austrian Ministry for Foreign Affairs in effecting service on OPEC.

*The Default Judgment and Injunction*

OPEC failed to answer Prewitt's motion within the twenty-day period fixed by Fed.R.Civ.P. 12(a)(1)(A). The Clerk of the Court entered a default judgment against OPEC on May 19, 2000.

District Judge Sharon L. Blackburn, to whom this case was initially assigned, set aside the default judgment on September 15, 2000, questioning whether OPEC had been properly served with process.

The case was subsequently assigned to Senior District Judge Charles R. Weiner of the Eastern District of Pennsylvania, sitting by designation. On Prewitt's

4

supplemental motion, the Court entered a second default judgment against OPEC and certified a class on December 11, 2002. The Court then ordered OPEC to appear at the Hugo L. Black Courthouse in Birmingham, Alabama, on March 8, 2001, and show cause why the relief sought by the Prewitt and the certified class should not be granted. A copy of the Show Cause Order was mailed to and received by OPEC at its headquarters. OPEC again failed to respond.

On March 22, 2001, the Court entered its Findings of Fact and Conclusions of Law. It found that OPEC was created and exists for the express purpose of controlling crude oil production and export; that there is a conspiracy between OPEC, its members, and non-OPEC members to fix and control crude oil prices; that OPEC's activities have a substantial and adverse impact on United States trade and commerce; that there is a daily impact of between $80 to $100 million in excess costs paid by United States consumers as a result of OPEC's actions; and that unless enjoined, the threat of continued injury from OPEC's restraints of trade would continue unabated. The Court concluded that it has subject matter jurisdiction under the Sherman and Clayton Acts; that OPEC is an "unincorporated association" within the meaning

of Rule 17(b)(1)and thus may be sued in this Court; that it has *in personam* jurisdiction over OPEC because it was served with process by international registered mail and filed no response, and OPEC has the requisite minimum contacts with the United States; and that the agreements coordinated and implemented by OPEC to fix and control the production and export of crude oil by its members are illegal *per se* under the Sherman and Clayton Acts.

Based on its Findings and Conclusions, the Court entered a Final Judgment and Order of Injunction (the "Injunction") against OPEC. It enjoined OPEC and those acting in concert and participation with OPEC, for a period of twelve months, from entering into any agreements to fix and control the production and export of crude oil, and from implementing and enforcing any agreements which do so. A copy of the Court's Orders were delivered to the U.S. embassies for the foreign member countries.

*Post-Judgment Relief*

Unsurprisingly, the Injunction captured OPEC's attention and apparently convinced it that the "whole thing" could no longer be ignored. On April 16, 2001, OPEC entered

a special appearance and moved for post-judgment relief. OPEC's requested stay of enforcement of the judgment was granted.

Because of a conflict of interest, Judge Weiner recused himself from this case, and it was subsequently reassigned to the undersigned judge.

Thereafter, the default judgment and Final Judgment and Order of Injunction were vacated. The Court then requested briefs and heard arguments on the threshold issue of the validity of service of process. It is to this question that the Court now turns.

## II.

The very concept of service of process stems from the due process clauses of the Fifth and Fourteenth amendments to the United States Constitution. Due process demands "notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (citing *Milliken v. Meyer*, 311 U.S. 457 (1940)).

7

The Supreme Court in *Murphy Brothers* recently emphasized the important role that formal service of process plays in the attainment of due process. Before the Court was question of whether the time to remove a state court action begins to run from informal receipt of the complaint or from official service of process. 526 U.S. 344. In addressing the question, the Supreme Court stated:

> We read Congress' provisions for removal in light of a bedrock principle: An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process.

*Id.* at 347. So significant is the formality of notice, the Court held, that a party's time to remove a case cannot be triggered even by actual notice when there has not been proper service of official process.

Rule 4 of the Federal Rules of Civil Procedure describes the manner in which service of process must be made in order to subject the defendant to the jurisdiction of the court. Rule 4(h)(2) governs service on corporations and associations outside the United States. It generally states that service may be effected on an unincorporated

association such as OPEC in any manner prescribed for individuals under Rule 4(f).[3]

Rule(f)(2)(C)(ii) provides:

> **(f) Service Upon Individuals in a Foreign Country.** Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed... may be effected in a place not within any judicial district of the United States:
>
> . . . .
>
> **(2)** if there is no internationally agreed means of service or the international agreements allows other means of service, provided that the service is reasonably calculated to give notice:
>
> . . . .
>
> **(C) unless prohibited by the law of the foreign country,** by
>
> . . . .
>
> **(ii)** any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served;.....

(emphasis added).

---

[3] Specifically, the rule provides that service upon a foreign corporation or association in a place not within any judicial district of the United States shall be done "in any manner prescribed for individuals by subdivision (f) except personal delivery..." Fed.R.Civ.P. 4(h)(2).

*Relevant Austrian Law*

The establishment of OPEC's headquarters in Vienna is predicated on a "Headquarters Agreement" between the Republic of Austria and OPEC. Article 5(2) of the Headquarters Agreement provides that service of legal process upon OPEC "shall **not** take place within the headquarters seat except with the express consent of and under conditions approved by the Secretary General." The Headquarters Agreement is an integral part of Austrian law.[4]

Additionally, the Austrian law on the Service of Legal Documents provides that the service of legal documents to foreign citizens or international organizations who are entitled to privileges and immunities shall be carried out with the assistance of the Federal Ministry for Foreign Affairs.

---

[4] Plaintiff argues that the Headquarters Agreement is a "special" law that falls outside the ambit of the phrase "the law of the foreign country" in Rule 4(f)(2)(C) and should not be "given effect by the Court" even if it falls within the boundaries of foreign "law" as intended by the Rule. Plaintiff fails, however, to provide the Court with any substantive support for these claims. The only evidence on point is that the Headquarters Agreement was passed by the Austrian Parliament, and was published in the *Austrian Gazette*. Furthermore, on January 1, 2002, the Embassy of Austria sent a letter to this Court, in which it characterized the Headquarters Agreement as "an integral part of Austrian law."

*Standard for Dismissal under Rule 12(b)(5)*

On a motion to dismiss for insufficiency of service under Rule 12(b)(5), the plaintiff bears the burden of establishing the validity of process. *Banco Latino, S.A.C.A. v. Gomez Lopez*, 53 F. Supp. 2d 1273, 1277 (S.D. Fla. 1999) (citing *Aetna Bus. Credit, Inc. v. Universal Decor & Interior Design, Inc.*, 635 F.2d 434, 435 (5th Cir. 1981)). Prewitt thus bears the burden of establishing that process was served upon OPEC in a manner consistent with Rule 4(f)(2)(C)(ii).

### III.

Until recently, the question of the validity of process served by mail upon an individual in a foreign country was an area of ambiguity for the courts. Up until 1993, the manner of service upon an individual in a foreign nation was prescribed by Rule 4(i)(1)(D), which provided for service, "by any form of mail, requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served." Without explicit congressional direction to the contrary, courts were left to determine whether service was adequate where it complied with American

norms of fairness, but did not comport with the methods prescribed as appropriate by the foreign national. Though courts inevitably differed in their approaches to the issue, most courts in the United States permitted use of the service methods even if such methods violated the law of the country in which service was effected. *See e.g., SEC v. International Swiss Investment Corp.*, 895 F.2d 1272 (9th Cir. 1990); *Bersch v. Drexel Firestone, Inc.*, 389 F. Supp. 446 (S.D.N.Y. 1974), *modified*, 519 F.2d 974 (2d Cir. 1975); *ALCO Standard Corp. v. Benalal*, 345 F. Supp. 14 (E.D. Pa. 1972).[5]

In the wake of diplomatic protest and conflicting court rulings, Congress amended Rule 4 in 1993. Among the changes was a clarification of Rule 4(i) through the addition of a requirement that service under the methods of the previous section (i) not be made in violation of foreign law. The replacement rule was designated as "Rule 4(f)." As noted earlier, it authorizes service by mail on a foreign unincorporated association unless "prohibited" by the law of

---

[5] A few lower court decisions indicated that service in violation of foreign law would not be valid for the purposes of domestic law. *See, e.g., Aries Ventures Ltd. v. AXA Finance S.A.*, 729 F. Supp. 289 (S.D.N.Y. 1990); *R.M.B. Electrostat, Inc. v. Lectra Trading AG*, 1983 WL 13711 (E.D. Pa. Jan. 20, 1983).

the foreign country in which service is sought to be effected.

This Court recognizes that ambiguities exist even under the revised Rule 4 (f). A number of courts have already undertaken to divine, with differing results, the draftspersons' intended meaning of the word "prohibited" in Rule 4(f)(2)(C)(ii).[6] Additionally, the Court recognizes

---

[6] Plaintiff argues that the "prohibited by" clause of Rule 4(f)(2)(C)(ii) refers only to means of service **expressly disallowed** by the law of the foreign national and that Plaintiff's method of service must be deemed valid because there is no Austrian law declaring the method invalid. Conversely, Defendant interprets the "prohibited by" clause of the Rule as referring to all means of service **not expressly allowed** by the law of the foreign national. Defendant argues that Plaintiff's method of service must be deemed invalid because there is no Austrian law declaring that service by mail may be used.
The question of the intended meaning of the "prohibited by" clause has been considered by a number of courts. Though a few courts have adopted the approach employed by Defendant, see, e.g., Proctor & Gamble Cellulose Co. v. Viskova-Loznica, 33 F. Supp.2d 644, 664-65 (W.D. Tenn. 1998); Graval v. P.T. Bakrie & Bros., P.T., 986 F. Supp. 1326 (C.D. Cal 1996), courts have more commonly interpreted the clause in the manner suggested here by Plaintiff. See Dee-K Enterprises, Inc. v. Heveafil SDN, BHD, 174 F.R.D. 376 (E.D. Va. 1997); see also Emery v. Wood Industries, Inc., 2001 WL 951579, at *2 (D.N.H. Aug. 20, 2001); Carnigal v. Kartria Shipping, Ltd., 2000 WL 1036224, at *2 (E.D. La. July 25, 2000); Banco Latino S.A.C.A. v. Gomez Lopez, 53 F. Supp. 1273, 1277 (S.D. Fla. 1999); Resource Ventures, Inc. v. Resources Management Int'l, Inc., 42 F. Supp.2d 423 (D. Del. 1999). Courts that have read the clause in this manner have rested their analysis on the idea that this is the only reading that gives subsection (f)(2)(C) operative effect. Were subsection (f)(2)(C) inapplicable where a form of return receipt mail is simply not prescribed by the laws of a foreign country, the subsection would be superfluous to subsection (f)(2)(A), which allows service in a foreign country in any matter "prescribed" by the law of that country.

that there may be cases in which the correct interpretation of foreign law is problematic. However, this case falls into neither of these categories. Even assuming that the draftspersons intended the term "prohibited" to require clear statutory language by the legislative body of the foreign national, this case reflects an example of such clear language.

---

Given that the Court finds statutory language expressly prohibiting the method of service employed by Prewitt, this finding is not dispositive of the case at bar, and the Court, therefore, need not issue a final ruling on it. However, based on the evidence before the Court, the Court is inclined to interpret the "prohibited by" clause in a way not argued by either party.

While Plaintiff and courts, such as *Dee-K*, correctly point out that reading the clause as prohibiting all that is not expressly allowed under local law is to deem the clause inoperative, the logical result of a determination that **some** non-prescribed means of service must be **potentially** allowable is not that **all** non-prescribed means are **actually** allowable. Rather, the Court is of the opinion that there are likely, in many nations, some non-prescribed methods of service that are judicially valid and some that are judicially invalid. Validity of a given method of service depends on whether or not the method complies with the judicial norms established by the foreign national itself. Indeed, this is an interpretation that most naturally applies to an analysis of the validity of a means of service employed in the United States. While there is no American law disallowing skywriting as a means of serving process, this is most assuredly a method of service that would be deemed unacceptable in any court. At the same time, methods such as service via facsimile are often deemed acceptable by courts despite the fact that there are no laws expressly allowing such means. *See, e.g., Wilkens v. Johnson*, 238 F. 3d 328 (5th Cir. 2001); *In re Town of Amenia*, 200 F.R.D. 200 (S.D.N.Y. 2001); In *re International Telemedia Associates, Inc.*, 245 B.R. 713 (Bankr. N.D. Ga. 2000).

14

The Austrian government, as a sovereign, has declared expressly – through both its legislative and treaty-making powers – that certified mail service directly upon OPEC is prohibited. Thus, there is no plausible basis for Prewitt's argument that the Headquarters Agreement is not a "part" of Austrian law. Not only have Austrian government officials declared the Agreement to be legally binding, but **the Headquarters Agreement was actually enacted into law by the Austrian Parliament.**

The Court therefore concludes that OPEC was not effectively served even though it actually received the summons and complaint, as unconsented to service by registered mail on OPEC is prohibited by Austrian law.

IV.

Economic globalization has fostered increasingly global litigation. As travel has become easier, and the prospect of production, assembly, distribution, and marketing each taking place in a different nation commonplace, the number of potential dispute-resolving fora and the rules that regulate these fora have multiplied rapidly. However, while

15

international economic barriers are falling, political barriers remain.  The world is one of separate sovereigns with distinct norms and rules, each mandating courtesy and periodic deference.  Though the rapidity and frequency with which this eco-political tension has arisen has often left courts attempting to navigate complex questions of policy, such questions are properly reserved only for the Legislature.

The notion of wholly insulating from service of process an entity such as OPEC - whose decisions surely affect the daily lives of most Americans - is, for many, a bitter pill to swallow. But the Court must apply the rules as they are written. The rules reflect a clearly expressed diplomatic policy choice of Congress to respect the normative and, ultimately, the legislative, decisions of foreign sovereigns.

By separate order, Defendant's Motion to Dismiss shall be granted, without prejudice, to the right of Plaintiff to pursue an alternate means of effecting service on Defendant.

Done this _21_ day of August, 2002.

_____
Chief United States District Judge
U. W. Clemon